## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| JOHN P. NEBLETT, as Chapter 7 | : | Nos. | 4:15-cv-01622 |
| Trustee of VALLEY FORGE | : | | 4:15-cv-01731 |
| COMPOSITE TECHNOLOGIES, | : | | 4:15-cv-01826 |
| INC., | : | | |
| | : | (Judge Brann) | |
| Plaintiff, | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| CLAIRMONT PACIELLO & CO., | : | | |
| P.C., MOUNTJOY CHILTON | : | | |
| MEDLEY LLP, MICHAEL DE | : | | |
| LEON HAWTHORNE and | : | | |
| THOMPSON COBURN LLP, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM

### June 8, 2016

There is no more ideal an image of hardworking American values

than that of a small-town manufacturer opening its factory doors. And in

recent years, there has been no more apt an illustration of the strength of

the American fiber than the way in which our country responded when

the terrorist attacks of September 11, 2001 threatened those values.

- 1 -

Although this case harkens to both of these examples of American exceptionalism in a compelling way, the disloyal acts that initiated the present dispute follow a more disappointing trajectory.

At this story's beginning, Robert Frost's nostalgic observation that "nature's first green is gold," may be just the way to describe the early flourishing of Valley Forge Composite Technologies, Inc., a Covington, Kentucky manufacturer of advanced technologies established in 1996 (hereinafter "Valley Forge"). So prosperous was Valley Forge in its incipient years that its devices were utilized in spacecrafts and in the wake of the September 11 attacks, in security screening devices at airports and at the 2014 Winter Olympics.

However, not even Frost, who admonished that gold was nature's "hardest hue to hold," could have envisioned the precise denouement that this American manufacturer would follow—to Frost's credit, neither could even the most inventive writers of fiction. As it unfolded, Valley Forge would ultimately meet its demise at the hands of a criminal scheme orchestrated by one of its co-founders. In stark contrast to the ideal

- 2 -

American company Valley Forge once billed itself to be, a federal

investigation would later culminate in the 2014 indictment of its co-

founder and CEO Louis J. Brothers, as well as his wife, Rosemary Brothers.

The indictment charged the couple with exporting various defense

technologies to Hong Kong and the People's Republic of China without

approval of the United States Department of State.

Upon his entering a plea of guilty to the indictment, Brothers

admitted that he used Valley Forge as a vehicle to further his illicit

international scheme by publicly reporting several contracts purchased for

Valley Forge products, contracts which never truly existed but instead

were intended to camouflage the revenues gained from his international

money laundering efforts.  The hollowness of Valley Forge's true business

now revealed, the price of the company's stock plummeted, and the

company was forced to file for Chapter 7 bankruptcy in late 2013.

The cases presently before this Court suggest that certain of the

accounting and legal professionals who provided services to Valley Forge

during the time of Brothers's scheme failed to fulfill their duty of

reasonable care to the company and consequently, to its shareholders. In

context, the sole issue presented in the underlying motions to dismiss is

whether Plaintiff, the Chapter 7 trustee for Valley Forge, has alleged

sufficient facts plausibly suggesting the Defendants' negligence. Because

the facts alleged in the Amended Complaint satisfy the plausibility

standard, Defendants' motions to dismiss will be denied. Nevertheless, the

foregoing analysis enumerates several factual considerations toward

which discovery and dispositive motions may effectively be directed.

I.    **BACKGROUND**

A.    **Founded in 1996, Valley Forge begins developing
      momentum wheels for spacecrafts, before expanding into
      the production of high-security airport screeners and related
      anti-terrorism devices in the wake of September 11, 2001.**

Founded in 1996, Valley Forge Composite Technologies developed,

acquired, produced, and sold certain advanced technologies and devices.[1]

At all relevant times, Valley Forge's sole places of business were an

administrative office located at 50 East River Center Boulevard, Covington,

---

[1]    Pl.'s Am. Compl., 4:15-cv-01622, ECF No. 20 ¶ 20.

Kentucky and a separate facility located in Erlanger, Kentucky.[2] Valley

Forge was founded by Louis J. Brothers and Larry K. Wilhide.[3] At all times

relevant to this litigation, Brothers was President and CEO of Valley Forge,

and his wife, Rosemary Brothers, was an administrative employee of the

company who acted as an in-house bookkeeper.[4]

The company's earliest product was a "momentum wheel," a

component used to stabilize the altitude of a spacecraft without using fuel

or other mechanisms.[5] The last Securities and Exchange Commission (SEC)

annual 10-K report filed by Valley Forge for the 2011 fiscal year explained

that momentum wheels "are used for energy storage to provide an

uninterrupted power supply."[6] The momentum wheels store energy and

---

[2]   Id. ¶ 6. Valley Forge was organized under the laws of the State of Florida. Id.
      ¶ 5.

[3]   Id. ¶ 7. See also See Neborsky v. Valley Forge Composite Technologies, Inc.,
      3:13-cv-02307-MMA-BGS, ECF No. 25 at 2 ¶ 1 (S.D. Cal. May 12, 2014).

[4]   Id. ¶ 8.

[5]   Id. ¶ 20.

[6]   United States Securities and Exchange Commission 2011 Form 10-K: Valley
      Forge Composite Technologies, Inc. at *4 (Mar. 30, 2012) (hereinafter "Valley

provide stabilization as they rotate at high speeds, "much like a spinning top."[7] "As they spin down, the stored energy can be released to produce power."[8]

As a result of the September 11, 2001 terrorist attacks, Valley Forge began developing homeland security and counter-terrorism products, including a passenger weapons screening device used in airports and at other high-security venues.[9] The weapons scanner, which was capable of detecting metal and non-metal objects hidden on or in the human body, was known as "ODIN" and was featured as the official security scanning device for the 2014 Winter Olympic Games in Sochi, Russia.[10]

In addition to the ODIN project, Valley Forge also was working to develop and bring to market a system that it named "THOR," which was a

---

Forge 2011 Form 10-K"), http://www.sec.gov/Archives/edgar/data/1332412/000121465912001424/s32312110k.htm.

[7] Id.

[8] Id.

[9] Am. Compl. ¶ 21.

[10] Id.

particle accelerator designed to detect illicit narcotics, explosives, and bio-chemical weapons hidden in cargo containers.[11] THOR operated by "creating photo nuclear reactions in light elements" and "selectively screening out all but the operational isotopes found in modern day explosives and narcotics," a process that could purportedly identify the illicit substance by making automatic comparisons between the observed particles and THOR's internal database.[12]

### B. Valley Forge secures a $250,000.00 investment from Lincoln Park Capital Fund.

To fund production, marketing and sale of momentum wheels, as well as the ODIN and THOR systems, Valley Forge entered into a common stock purchase agreement with Chicago-based institutional investor Lincoln Park Capital Fund, LLC.[13] According to Plaintiff's Amended Complaint, Lincoln Park agreed to purchase $250,000.00 worth of Valley

---

[11]   Id. ¶ 22.

[12]   Valley Forge 2011 Form 10-K at *5.

[13]   Am. Compl. ¶¶ 23, 26.

Forge's common stock and committed to invest, at Valley Forge's sole option, up to an additional $20 million of equity capital.[14]

As Plaintiff characterizes it, the agreement with Lincoln Park gave Valley Forge sole control over "the timing and amount of future investment."[15] For instance, Valley Forge alleges that there no upper limits on the price the fund was obligated to pay to purchase its common stock, as "the purchase price of the shares would be based on the prevailing market prices of Valley Forge's shares immediately preceding the notice of sale to Lincoln Park, without any fixed discount."[16] "Lincoln Park was obligated to make the stock purchases as solely determined by Valley Forge."[17]

**C.**     **Brothers establishes and becomes co-owner of the Russian entity Minitron Ltd., which he allegedly uses as a vehicle for self-dealing at Valley Forge's expense.**

---

[14]   Id. ¶ 23.

[15]   Id. ¶ 24.

[16]   Id. ¶ 25.

[17]   Id. ¶ 24.

At some point during the course of Valley Forge's production and capital acquisition, Brothers, together with Valery Raevsky, a nuclear physicist at the Lebedev Physical Institute of the Russian Academy of Sciences, established and operated a Russian business entity named Minitron Ltd.[18] Brothers was a fifty percent owner of Minitron.[19] Valley Forge now alleges that Brothers, acting solely for his own benefit, caused Minitron to acquire licenses for critical technology required for the development and production of THOR, including electronics, hardware, and software.[20]

According to the Amended Complaint, Brothers never disclosed to Valley Forge or its board of directors the extent or nature of his ownership interest in Minitron.[21] To the contrary, Valley Forge alleges that on November 29, 2012, Brothers, having already overseen Minitron's acquisition of the above technology critical to THOR's operation, caused

---

[18]   Id. ¶ 27.

[19]   Id. ¶ 28.

[20]   Id. ¶ 29.

[21]   Id. ¶ 31.

Valley Forge to enter into agreements with Minitron for Brothers's own personal benefit.[22] Under these agreements, Minitron would provide the technology to Valley Forge at an aggregate cost of $1,160,000.00.[23]

**D.      Brothers uses Minitron to engage in the exportation of radiation hardened chips to China in violation of federal law and regulations.**

Beginning in or around 2009, Brothers entered into several agreements with foreign entities that permitted him to purchase thousands of electronic components known as "radiation hardened chips," also referred to as "rad-hard chips" or simply "rad-chips."[24] According to the Amended Complaint, "Rad-chips are a type of electronic component specially developed to resist radiation levels for operation in space, high altitude and nuclear facilities in order to prevent malfunctioning due to the presence of ionizing radiation."[25] Because of their potential application in military and nuclear devices, rad-chips are classified as a "defense article,"

---

[22]   Id. ¶ 30.

[23]   Id.

[24]   Id. ¶ 32.

[25]   Id. ¶ 33.

and their exportation is strictly regulated by the Arms Export Control Act, the International Traffic in Arms Regulations, the Export Administration Act of 1979, and the Export Administration Regulations.[26]

Brothers thereafter sold thousands of the rad-chips to China.[27] The rad-chips that Brothers sold to China were very highly radiation hardened, capable of operating in the outermost satellite orbits used by the military.[28] The rad-chips involved were classified as "weapon-grade defense articles," were designated as "controlled articles" and could not be exported absent approval from the State Department's Directorate of Defense Trade Controls.[29] In fact, certain government regulations provided that it is the policy of the United States government to deny licenses or other approvals

---

[26]   22 U.S.C. §§ 2778 et seq.; 2 C.F.R. §§ 120 et seq.; 50 U.S.C. App'x §§ 2401 et seq.; 15 C.F.R. §§ 730 et seq.

[27]   Am. Compl. ¶ 32.

[28]   Id. ¶ 35.

[29]   Id. ¶¶ 35–36.

for certain defense articles, including rad-chips, destined for certain restricted or embargoed countries, including China and Russia.[30]

### E.   Brothers uses revenues from the rad-hard chip deportation scheme to defraud Valley Forge.

Plaintiff suggests that in an effort to conceal the ultimate destination of the rad-chips and to facilitate the scheme, Brothers prepared and submitted end-use certificates falsely representing that Valley Forge was the end-user of the rad-chip shipments.[31] According to the Amended Complaint, Brothers and his wife opened several bank accounts in Valley Forge's name, without the company's knowledge or approval, which the couple subsequently utilized to launder funds from the illegal sale of rad-chips and to wrongfully divert portions of Valley Forge's funds for use in the rad-chip scheme.[32]

Plaintiff further alleges that Brothers "diverted Valley Forge's capital raised from investors and legitimate business operations . . . to the

---

[30]   Id. ¶ 37.

[31]   Id. ¶ 43.

[32]   Id. ¶ 44–45.

acquisition and export of additional rad-chips, all without Valley Forge's

knowledge or consent."[33] In addition, Brothers allegedly used $400,000.00

in revenue generated from the rad-chip scheme to repay a personal loan he

had previously made to Valley Forge.[34] "At all relevant times herein

mentioned, Valley Forge did not receive any benefit from Brothers afore-

described scheme of illegal acquisition, sale and export of rad-chips."[35]

> **F.    Defendant Clairmont Paciello & Co., P.C., prepares Valley Forge's accounting and financial records during the time of Brothers's rad-chip scheme.**

Importantly for our purposes here, Plaintiff alleges that "Brothers, in

an effort to conceal his scheme of illegal acquisition sale and export of rad-

chips, falsely represented to Valley Forge and its board of directors and

through public announcements and filings with the SEC, that all Valley

Forge's revenues were generated through the sale of momentum

wheels."[36] As detailed more fully below, the Defendants allegedly

_____

[33]   Id. ¶ 46.

[34]   Id. ¶ 48.

[35]   Id. ¶ 51.

[36]   Id. ¶ 49.

prepared, audited, or otherwise oversaw the preparation and filing of

Valley Forge's accounting and financial records during the time of

Brothers's rad-chip scheme.

Specifically, Plaintiff alleges that Defendant Clairmont Paciello &

Co., P.C., a King of Prussia, Pennsylvania-based accounting services firm,

"was engaged by Valley Forge to provide all of its accounting needs,

including, but not limited to, preparation of financial statements, profit

and loss statements, balance sheets, revenue statements, accounts payable

statements and accounts receivable statements."[37] Clairmont Paciello

provided these services to Valley Forge "in connection with its operations

in the State of Kentucky."[38] According to Plaintiff, "[t]he professional

accounting services which serve as the basis for Plaintiffs claims were

rendered in Kentucky, to an entity located in, and which operated its

business from, Kentucky."[39] In turn, Plaintiff suggests that Valley Forge's

---

[37]   Id. ¶ 66.

[38]   Id.

[39]   ECF No. 31 at 9.

management and board of directors used the financial and accounting data prepared by Clairmont Paciello to make important business decisions.[40]

Defendant's obligation to review Valley Forge's financial statements with due diligence notwithstanding, Plaintiff contends that Valley Forge's disclosures represented that several new momentum wheel contracts represented its sole source of revenue, even though "all the working papers and spreadsheets prepared and utilized by Clairmont Paciello to render the accounting services clearly indicated that Valley Forge did not sell or derive any income from the sale of momentum wheels."[41]

Specifically, Plaintiff alleges that Defendant Clairmont Paciello and Rosemary Brothers worked together to compile what were known as "Lucy Spreadsheets," documents that itemized and detailed, by contract number, units, cost per unit, sale price per unit, supplier, number of units shipped, total contract price, amounts received and invoice number, the

---

[40]   ECF No. 20 at 11 ¶ 67.

[41]   Id. ¶¶ 71, 73.

rad-chips illegally acquired by Louis Brothers for export.[42] Plaintiff

contends that the Lucy Spreadsheets "clearly established" that the revenue

generated by Valley Forge during the pertinent reporting periods was

derived solely from the sale and export of rad-chips to China and not in

any part from the sale of momentum wheels.[43]

In fact, Plaintiff suggests that reasonable care and due diligence on

the part of Defendant Clairmont Paciello in the form of reconciling the

Lucy Spreadsheets with Valley Forge's other financial statements would

have revealed the existence of the rad-chip scheme for several reasons.

First, he notes that the working papers and spreadsheets prepared and

utilized by Clairmont Paciello in rendering its accounting services to

Valley Forge show that the company did not purchase or acquire any

material for use in the production of momentum wheels.[44] Second, Plaintiff

contends that a proper reconciliation of the financial statements would

---

[42]   Id. ¶ 74.

[43]   Id. ¶ 75.

[44]   Id. ¶ 76.

have shown that the revenue generated by Valley Forge derived solely

from the sale of rad-chips and not that of momentum wheels.[45] Third,

Plaintiff notes that reasonable care in preparing the accounting and

financial statements would have revealed that no contracts for the sale of

momentum wheels between Valley Forge and customers existed during

the applicable reporting periods.[46]

In addition, Plaintiff points to several questionable features of

Valley Forge's fund disbursement process that otherwise would have been

detected by an adequate review. For instance, Plaintiff notes that the

company's disbursement process "presented an opportunity for

unauthorized payments and misappropriation" as a consequence of Mr.

and Mrs. Brothers having sole control over the cash disbursement process,

the payment of invoices, and the transfer of bank account funds.[47] To that

end, Plaintiff suggests that a proper review would have revealed the

---

[45]  Id. ¶ 78.

[46]  Id. ¶ 80.

[47]  Id. ¶¶ 81–82.

existence of the bank accounts used by Brothers and his wife to launder

money in connection with the rad-chip scheme.[48]

From 2009 through 2012, Valley Forge paid Clairmont Paciello more

than $570,000.00 in fees for the accounting services it was to perform.[49]

Plaintiff contends that as a result of Clairmont Paciello's negligence, it

suffered "significant losses and damages," including "loss of business

opportunity and sales, cancellation of the Lincoln Park Agreement,

significant loss in its value as an operating and going business concern,

and damage to its reputation."[50] Plaintiff claims that this loss totals no less

than $50 million.[51] Plaintiff's Amended Complaint asserts counts of

negligence and gross negligence against Clairmont Paciello.[52]

   **G.    Defendant Mountjoy Chilton Medley, LLP, prepares Valley
          Forge's accounting and financial records during the time of
          Brothers's rad-chip scheme.**

---

[48]  Id. ¶ 85.

[49]  Id. ¶ 94.

[50]  Id. ¶ 93.

[51]  Id. ¶ 95.

[52]  Id. ¶¶ 65–95, 96–100.

Plaintiff also asserts counts of negligence and gross negligence against Mountjoy Chilton Medley, LLP, a Cincinnati, Ohio-based accounting services firm.[53] According to the Amended Complaint, from October 2010 through December 2012, Mountjoy Chilton Medley was engaged by Valley Forge as an independent registered public accounting firm to audit its financial statements, consolidated balance sheets and statements of operations, shareholder's equity and cash flows, and to express an independent opinion on these financial statements based on its audits."[54]

Plaintiff suggests that as the independent auditor of Valley Forge, Mountjoy Chilton Medley failed to carry out its professional obligations as prescribed by the Public Company Accounting Oversight Board (PCAOB) standards and Generally Accepted Accounting Principles (GAAP).[55] Specifically, Plaintiff points to Mountjoy Chilton Medley's obligation to

---

[53]   Id. ¶¶ 101–43, 144–48.

[54]   Id. ¶ 102.

[55]   Id. ¶¶ 106, 127–28, 138–39.

"obtain reasonable assurance about whether the financial statements are free of material misstatements."[56]

To that end, Plaintiff points out that the notes to Valley Forge's consolidated financial statements for fiscal years 2010 and 2011 as filed with the Securities Exchange Commission contain the following statement:

> During [the prior two years], the Company won numerous contracts to produce momentum wheels and various mechanical devices for special projects. This represents all of the Company's revenues during these periods.[57]

According to Plaintiff, however, the above representation was "materially false," as Valley Forge did not win any contracts to produce momentum wheels during the reporting period, nor did any such contracts represent any of the company's revenues during the reporting period.[58]

Nevertheless, Defendant Mountjoy Chilton Medley made the following affirmative certification in 2011:

> In our opinion, the consolidated financial statements . . . present fairly, in all material respects, the financial position of

---

[56]   Id. ¶ 107.

[57]   Id. ¶ 112.

[58]   Id. ¶ 113.

> Valley Forge Composite Technologies, Inc. and its subsidiaries
> as of December 31, 2010, and the results of their operations
> and their cash flows for the year then ended, in conformity
> with U.S. generally accepted accounting principles.[59]

That certification was included with Valley Forge's Security and Exchange

Commission S-1 initial securities registration form filed on December 30,

2011.[60] Mountjoy Chilton Medley made a similar affirmative certification in

connection in 2012 as to Valley Forge's 2011 financial statements.[61] The

2012 certification by Mountjoy Chilton Medley was also included in two

subsequent amended S-1 registration forms filed by Valley Forge in 2012.[62]

Much like the allegations against Clairmont Paciello, Plaintiff

contends that had Mountjoy Chilton Medley acted with reasonable care

---

[59]   Id. ¶ 114.

[60]   Id. ¶ 115. Valley Forge executed one of its earliest privately exempt sales of securities on or around August 24, 2006 pursuant to Rule 506 of the SEC's Regulation D.  See  https://www.sec.gov/Archives/edgar/vprr/06/9999999997-06-037166. However, the 2011 and 2012 S-1 and Amended S-1 forms were submitted with the purpose of registering shares for a public offering pursuant to the Securities Act of 1933. See https://www.sec.gov/Archives/edgar/data/1332412/000121465911004582/s122810s1.htm.

[61]   Am. Compl. ¶ 121.

[62]   Id. ¶¶ 124–26.

and due diligence in by auditing the pertinent records in conformity with

accepted accounting standards, it would have discovered the existence of

Brothers's illegal rad-chip scheme.[63] Plaintiff attributes the same $50

million damages figure to Mountjoy Chilton Medley as it did to Clairmont

Paciello.[64] It notes that from 2010 through 2012, Valley Forge paid

Mountjoy Chilton Medley $500,000.00 to perform the disputed audits.[65]

**H.     Defendants Michael de Leon Hawthorne and Thompson Coburn LLP purportedly assist Brothers in perpetuating the illegal rad-chip scheme by refusing to report, reconcile, and otherwise investigate the inconsistencies between Valley Forge's financial statements and its business operations.**

According to the Amended Complaint, Defendants Thompson

Coburn LLP and Michael de Leon Hawthorne, Esquire, an employee of the

former, were engaged as outside legal counsel for Valley Forge during the

time Brothers carried out the rad-chip scheme.[66] These legal services

Defendants were purportedly responsible "for the preparation, review and

---

[63]   Id. ¶¶ 129–39.

[64]   Id. ¶ 143.

[65]   Id. ¶ 142.

[66]   Id. ¶ 150.

filing of all required reports by Valley Forge with the SEC, including, but not limited to, Form 8-K filings, Form 10-Q filings, and Form S-1 filings."[67] As recited earlier, several of these filings contained representations as to Valley Forge having secured momentum wheel contracts, representations that Plaintiff contends were material misstatements of the company's true status.[68]

Plaintiff essentially contends that these Defendants played a knowing role in Brothers's cover-up of the rad-chip scheme. Such cover-up became apparent, Plaintiff suggests, in 2011, when Valley Forge entered into a consulting and services agreement with Idaho State University, pursuant to which the University through its Accelerator Center would assemble one of Valley Forge's THOR demonstration unites in Pocatello, Idaho.[69]

---

[67] Id. ¶ 151.

[68] Id. ¶¶ 153–54.

[69] Id. ¶ 155.

As Plaintiff recounts, things began to unravel during a March 2012 meeting between representatives from the University's Accelerator Center and Brothers, Valley Forge's general counsel Keith McClellan, Esquire, and Kyle Seger, one of Valley Forge's aerospace engineers.[70] During the course of the meeting, Valley Forge's representatives were apparently informed by representatives from the University's Accelerator Center that "the racetrack accelerator portion of the THOR system was not a commercially-viable tool."[71]

Immediately following the meeting, McClellan informed Hawthorne as to the conclusions offered by the University's representatives.[72] Specifically, McClellan told Hawthorne that this information should be disclosed by Valley Forge in its SEC 10-Q report and its Form S-1 statements.[73] Such disclosures were never made, despite Valley Forge's obligation as a publicly traded company to disclose relevant information

---

[70]   Id. ¶ 156.

[71]   Id. ¶ 157.

[72]   Id. ¶ 158.

[73]   Id.

regarding its financial position.[74] Plaintiff contends this is the case despite McClellan having informed Hawthorne via email on April 26, 2012 and again in May 2012 as to the suspected misrepresentations.[75] In those emails, McClellan requested that Hawthorne provide a legal opinion as to whether Valley Forge's board of directors should be informed about the suspected misrepresentations.[76]

According to the Plaintiff, the schism between Brothers and McClellan widened in late May 2012 when McClellan learned from Seger that contrary to the prior public announcements and representations, the revenues generated by Valley Forge were not deriving from the sale of momentum wheels at all.[77] At or around this same time, Brothers informed Valley Forge's board of directors that the company needed to post a bond for approximately $300,000.00 to finalize a contract for the sale of THOR

---

[74]   Id. ¶¶ 159–62.

[75]   Id. ¶¶ 163–64.

[76]   Id.

[77]   Id. ¶ 166.

system in Guatemala.[78] Thereafter, McClellan, who also served as secretary of the board at the time, prepared an agenda for a meeting of the board that specifically set forth in writing several issues concerning the company's commercial viability to be discussed at an upcoming meeting of the board.[79]

Before the meeting took place, McClellan allegedly confronted Brothers on May 24, 2012 as to the existence of the Guatemalan contract and other purported sales of momentum wheels.[80] McClellan allegedly questioned Brothers as to whether his report of the Guatemalan contract "was a fraud."[81] The next day, Brothers, acting on the advice of Hawthorne, cancelled the upcoming board of directors meeting and unilaterally authorized a payment of $300,000.00 that purported to secure

---

[78] Id. ¶ 167. McClellan recalls the Guatemalan transaction purportedly involving an entity known as the Symmetry Group LLC or "Symmetry." Id.

[79] Id. ¶ 168.

[80] Id. ¶ 169.

[81] Id. ¶ 170.

the Guatemalan contract.[82] Five days later, Brothers issued a public

statement prepared by Hawthorne that suggested Valley Forge had

reached an agreement with to sell a THOR unit to the Guatemalan

government, worth upwards of $5 million.[83] The announcement was

echoed in a May 2012 Form 8-K prepared with the assistance of

Hawthorne and Thompson Coburn.[84] That 8-K Form read in pertinent part

as follows:

> On May 30, 2012, Valley Forge Composite Technologies, Inc.
> (the "Valley Forge") announced that it had reached an
> agreement in principle with a private US based company that
> is negotiating an agreement (the "Agreement") with a Latin
> American government for the first commercial development,
> delivery and maintenance of a THOR LVX photonuclear
> detection system.[85]

Following the events of late May 2012, McClellan reports that

he repeatedly demanded a copy of the Guatemalan THOR contract

---

[82]   Id. ¶¶ 171–72.

[83]   Id. ¶ 173

[84]   Id. ¶ 175.

[85]   http://www.sec.gov/Archives/edgar/data/1332412/000121465912002456/
j529201238k.htm.

from Brothers, Hawthorne, and Thompson Coburn.[86] A copy was

never provided.[87] On November 14, 2012, at the advice and direction

of Defendants Hawthorne and Thompson Coburn, McClellan was

replaced as secretary and excluded from any further meetings of the

board as a result of his insisting that the prior announcements

regarding the Guatemalan contract needed to be amended or

retracted.[88] Twelve days later, on November 26, 2012 and again at

the advice and direction of Defendants Hawthorne and Thompson

Coburn, McClellan's employment with Valley Forge was

terminated.[89]

Plaintiff recites the same $50 million damages figure against

Hawthorne and Thompson Coburn.[90] It alleges counts of gross

negligence and breach of fiduciary duty for the damages sustained

---

[86]   Am. Compl. ¶ 179.

[87]   <u>Id.</u>

[88]   <u>Id.</u> ¶ 180.

[89]   <u>Id.</u> ¶ 181.

[90]   <u>Id.</u> ¶¶ 186–87.

as a result of the two Defendants' failure to exercise reasonable care

in its rendering legal services to Valley Forge while Brothers was

carrying out the rad-chip scheme.[91] In Count Seven of the Amended

Complaint, Plaintiff also seeks to have Defendant Thompson

Coburn's bankruptcy claim against Valley Forge declared ineffective

on the ground that it was procured by means of wrongful and illegal

conduct.[92]

> **I.    Brothers is indicted and later pleads guilty to aiding and abetting the illegal export of defense articles and conspiracy to launder money.**

On February 6, 2013, Valley Forge made the following public

announcement:

> The Company is discussing with the U.S. Attorney for the Eastern District of Kentucky allegations that it exported over $37 million worth of military semiconductors to Hong Kong since about 2009 in violation of the International Traffic in Arms Regulations. Although the Company's internal investigation is in its early stages, the Company has reason to believe that the vast majority of these exports involved commercial semiconductors that were clearly not subject to

---

[91]   Id. ¶ 186.

[92]   Id. ¶¶ 194–98.

control under the ITAR, and were not controlled for export to Hong Kong under the Export Administration Regulations. The U.S. Attorney executed a search warrant on the Company and subsequently seized the bank accounts of the Company, which held approximately $1.5 million, reportedly on the basis that these funds were entirely the proceeds of illegal exports or an instrumentality thereof, which the Company denies.[93]

In response to the news, Valley Forge's publicly traded common stock plunged in value, falling from 14.9 cents per share to 5.7 cents per share (or 62%) on a volume of 1.3 million shares on that day alone.[94] The company's stock could not recover but effectively became valueless, trading at or around 2 cents per share in late 2013 and early 2014.[95]

On August 14, 2014, a federal grand jury sitting in Covington, Kentucky for the Northern Division of the United States District Court for the Eastern District of Kentucky returned a 31-count

---

[93] Valley Forge Composite Technologies, Inc. Form 8-K, http://www.sec.gov/Archives/edgar/data/1332412/000121465913000631/c261318k.htm.

[94] See Neborsky v. Valley Forge Composite Technologies, Inc., 3:13-cv-02307-MMA-BGS, ECF No. 25 at 14 ¶ 34 (S.D. Cal. May 12, 2014).

[95] Id. ¶ 38.

indictment against Brothers and his wife for their involvement in the

alleged rad-chip scheme.[96] The indictment charged, among other

allegations, that the couple "did knowingly and willfully conspire to

export and cause to be exported goods designated as defense articles

. . . to Hong Kong and the [People's Republic of China], without

obtaining a license or written authorization from the Department of

State."[97] It also accused the pair of "conspir[ing] to conduct and

attempt[ing] to conduct financial transactions . . . which involved the

proceeds of a specified unlawful activity."[98] The case was prosecuted

by counsel from both the United States Attorney's Office for the

Eastern District of Kentucky and the Counter Espionage Section of

the United States Department of Justice's National Security Division.

On July 30, 2015, Brothers agreed to plead guilty to several of

the counts in the indictment, including those charging that he aided

---

[96]  United States v. Brothers, et al., 2:14-cr-00035-ART-CJS, ECF No. 3 Ex. 3 (E.D. Ky. 2014).

[97]  Id. at Page: 4 of 16, Page ID#: 43.

[98]  Id. at Page: 8 of 16, Page ID#: 47.

and abetted the illegal export of defense articles and conspired to launder money.[99] As part of the plea agreement, Brothers admitted the following facts, of which this Court now takes judicial notice:

> h.      At all times relevant herein, the Defendant was the President and Chief Executive Officer (CEO) of Valley Forge Composite Technologies (VFCT), a publically traded company, the offices of which were located at 50 East Rivercenter Boulevard, Suite 820., Covington, KY 41011.

> i. VFCT's stated business was the development, manufacture, and distribution of detection systems and instruments and the design and manufacture of attitude control instruments for small satellites. Among VFCT's detection systems were "THOR LVX," a photonuclear detection system, and "ODIN," a passenger weapons scanning device. VFCT's product for small satellites was mini momentum reaction wheels.

> j. VFCT was unsuccessful in developing THOR and ODIN for manufacture and production. In fact, THOR and ODIN were never manufactured, sold or distributed to any person or business entity. In addition, a few mini momentum reaction wheels were sold before 2006, but VFCT realized little or no profit from those sales. VFCT never generated sales, income or profit from THOR, ODIN, and the mini momentum reaction wheels.

> k. In 2009 and continuing through January 22, 2013, the Defendant began to broker various microcircuits, which were defense articles, to Hong Kong and the PRC [People's

---

[99]   United States v. Brothers, ECF No. 49 at Page: 1 of 13, Page ID#: 177.

Republic of China]. Generally, the Defendant purchased the microcircuits from manufacturers and other brokers, specifically, Peregrine Semiconductors, Aero flex, and Avnet. Peregrine, Aero flex and Avnet would ship the microcircuits to the Defendant's business address in Covington, Kentucky. VFCT's office contained an interior room with no windows and one entrance. This room was used to repackage the microcircuits for export. This room was secured by a lock the Defendant had installed on the door to safely store the microcircuits and limit access to them. When the microcircuits were delivered to the office, the Defendant and others would remove the microcircuits from their original packaging, which was designed to insure the integrity of the microcircuits during shipping. The Defendant and others would then repackage the microcircuits in Federal Express (FEDEX) packaging for export. They often marked the FEDEX packages as "computer memory chips" and understated the value of the contents. The Defendant and others insured the original packaging and labels were destroyed or shredded. The Defendant and others would then export the microcircuits to Hong Kong and the PRC by FEDEX.

. . .

o. In the transactions charged, Peregrine and Avnet required the Defendant to submit end-user statements to them before shipping the microcircuits to VFCT. The Defendant would falsify these end-user statements, stating the microcircuits were for application in THOR or ODIN and would not be exported from the United States. One Aeroflex end user statement was executed by a purchaser of microcircuits and showed the intended use of those products in the People's Republic of China. That end user statement

was not returned to Aeroflex. The Defendant falsified or failed
to return the end-user statements to avoid detection.[100]

Particularly relevant to the present action is Paragraph S of the plea

agreement, which reads as follows:

> s. VFCT was a publically traded company, required to
> make regular filings with the Security and Exchange
> Commission (SEC). As the President and CEO, the Defendant
> provided the factual basis for the filings, and approved each
> document for filing with the SEC. The Defendant concealed
> his activities exporting the microcircuits to China and the PRC
> making false statements on the SEC filings so as to avoid
> detection. In general, the Defendant represented to the SEC
> and investors that VFCT's revenues and profits were from the
> sale of various aerospace products and other mechanical
> devises including momentum wheels, but implied that sales
> of THOR and ODIN were imminent when they were not. In
> addition, the Defendant in March, 2008, represented VFCT
> was in the business of buying and selling electronic parts for
> resale to foreign markets, primarily Japan. In fact, almost all of
> the revenues and profits of VFCT between 2009 and January,
> 2013 were from the export of microcircuits to Hong Kong and
> the PRC without a license or written permission of the
> Department of State.[101]

---

[100] <u>Id.</u> at Pages 3–5 of 13, Page ID #'s: 179–81.

[101] <u>Id.</u> at Pages 6–7 of 13, Page ID #'s: 182–83.

On March 2, 2016, Brothers was sentenced to a total of 93 months in federal prison for his orchestration of the rad-chip scheme.[102] The charges against Rosemary Brothers were thereafter dismissed.[103]

> **J.     After Valley Forge filed for bankruptcy, and this Court withdrew the reference to the United States Bankruptcy Court for the Middle District of Pennsylvania, the Defendants filed the instant motions to dismiss, which now must be denied.**

On October 9, 2013, Valley Forge filed for Chapter 11 Bankruptcy before the Honorable John J. Thomas in the United States Bankruptcy for the Middle District of Pennsylvania.[104] After the pertinent events giving rise to this litigation had unfolded and ownership of Valley Forge had changed hands, records indicate that the company relocated its principal place of business to State College, Pennsylvania around that time.[105]  On

---

[102]  United States v. Brothers, ECF No. 75 at Page: 2 of 6, Page ID#: 424.

[103]  Id. at Page 1 of 6, ID#: 423.

[104]  See 4:13-bk-05253 ECF No. 1.

[105]  See, e.g., 4:13-bk-05253 ECF No. 1 at 1.

February 18, 2015, the bankruptcy was converted to a Chapter 7 proceeding.[106]

On September 21, 2015, this Court withdrew the reference to the bankruptcy court pursuant to 28 U.S.C. § 157(d).[107] This Court transferred one companion case to the United States District Court for the Eastern District of Kentucky for purposes of proper venue, pursuant to 28 U.S.C. § 1404(a), finding "that the Plaintiff's principal place of business and manufacturing operations [was] in Covington, Kentucky at all times relevant to [ ] its underlying complaint."[108] After the Defendants each filed a motion to dismiss, the Plaintiff filed its Amended Complaint on October 20, 2015.[109] The Defendants thereafter filed renewed motions to dismiss.[110]

---

[106] See 4:13-bk-05253 ECF No. 530.

[107] 4:15-cv-01622 ECF No. 12.

[108] Neblett v. Brothers, et al., 4:15-cv-01629 ECF No. 16. A securities law class action lawsuit against Valley Forge, Brothers, and Wilhide is also proceeding before the United States District Court of the Southern District of California. See Neborsky v. Valley Forge Composite Technologies, Inc., 3:13-cv-02307-MMA-BGS.

[109] 4:15-cv-01622 ECF No. 20.

The sole question before the Court at this stage of the litigation is whether Plaintiff's Amended Complaint has stated a claim against the Defendants that plausibly entitles the estate to relief pursuant to the decisions of the Supreme Court of the United States in <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u>, as well as that of the United States Court of Appeals for the Third Circuit in <u>Connelly v. Lane Construction Corp</u>. As detailed more fully below, the factual allegations contained in Plaintiff's Amended Complaint far exceed the Supreme Court's plausibility requirement. Accordingly, the Defendants' Motions to Dismiss must therefore be denied.

## II.    LAW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may file a motion to dismiss for "failure to state a claim upon which relief can be granted." Such a motion "tests the legal sufficiency of a pleading" and "streamlines litigation by dispensing with needless discovery and

---

[110] Defendant Mountjoy Chilton Medley did not file a renewed motion to dismiss, but rather argues that its original motion survived Plaintiff's filing of the Amended Complaint because that filing did not remedy the shortcomings that the initial motion to dismiss purported to identify.

factfinding."[111] "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[112] This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[113]

Beginning in 2007, the Supreme Court of the United States initiated what some scholars have termed the Roberts Court's "civil procedure revival" by significantly tightening the standard that district courts must apply to 12(b)(6) motions.[114] In two landmark decisions, <u>Bell Atlantic Corporation v. Twombly</u> and <u>Ashcroft v. Iqbal</u>, the Roberts Court "changed . . . the pleading landscape" by "signal[ing] to lower-court judges that the stricter approach some had been taking was appropriate

---

[111] <u>In re Hydrogen Peroxide Litigation</u>, 552 F.3d 305, 316 n.15 (3d Cir. 2008) (Scirica, C.J.) (quoting <u>Szabo v. Bridgeport Machines, Inc.</u>, 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)). <u>Neitzke v. Williams</u>, 490 U.S. 319, 326–27 (1989).

[112] <u>Neitzke</u>, 490 U.S. at 326 (citing <u>Hishon v. King & Spalding</u>, 467 U. S. 69, 73 (1984)).

[113] <u>Neitzke</u>, 490 U.S. at 327.

[114] Howard M. Wasserman, <u>The Roberts Court and the Civil Procedure Revival</u>, 31 Rev. Litig. 313 (2012).

under the Federal Rules."[115] More specifically, the Court in these two decisions "retired" the lenient "no-set-of-facts test" set forth in <u>Conley v. Gibson</u> and replaced it with a more exacting "plausibility" standard.[116]

Accordingly, after <u>Twombly</u> and <u>Iqbal</u>, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[117] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[118] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[119] Moreover, "[a]sking for plausible grounds . . . calls for enough facts to

---

[115] 550 U.S. 544 (2007); 556 U.S. 662, 678 (2009). Wasserman, <u>supra</u> at 319–20.

[116] <u>Iqbal</u>, 556 U.S. at 670 (citing <u>Conley v. Gibson</u>, 355 U.S. 41 (1957)) ("[a]cknowledging that <u>Twombly</u> retired the <u>Conley</u> no-set-of-facts test").

[117] <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).

[118] <u>Iqbal</u>, 556 U.S. at 678.

[119] <u>Connelly v. Lane Const. Corp.</u>, No. 14-3792, 2016 WL 106159, at *3 (3d Cir. Jan. 11, 2016) (Jordan, J.) (internal quotations and citations omitted).

raise a reasonable expectation that discovery will reveal evidence of

[wrongdoing]."[120]

The plausibility determination is "a context-specific task that

requires the reviewing court to draw on its judicial experience and

common sense."[121] No matter the context, however, "[w]here a complaint

pleads facts that are 'merely consistent with' a defendant's liability, it

'stops short of the line between possibility and plausibility of entitlement

to relief.'"[122]

When disposing of a motion to dismiss, a court must "accept as true

all factual allegations in the complaint and draw all inferences from the

facts alleged in the light most favorable to [the plaintiff]."[123] However, "the

tenet that a court must accept as true all of the allegations contained in the

---

[120] Twombly, 550 U.S. at 556.

[121] Iqbal, 556 U.S. at 679.

[122] Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557 (internal quotations omitted)).

[123] Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

complaint is inapplicable to legal conclusions."[124] "After <u>Iqbal</u>, it is clear

that conclusory or 'bare-bones' allegations will no longer survive a motion

to dismiss."[125] "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice."[126]

As a matter of procedure, the United States Court of Appeals for the

Third Circuit has instructed that:

> Under the pleading regime established by <u>Twombly</u> and
> <u>Iqbal</u>, a court reviewing the sufficiency of a complaint must
> take three steps. First, it must tak[e] note of the elements [the]
> plaintiff must plead to state a claim. Second, it should identify
> allegations that, because they are no more than conclusions,
> are not entitled to the assumption of truth. Finally, [w]hen
> there are well-pleaded factual allegations, [the] court should
> assume their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.[127]

## III.   ANALYSIS

### A.   Defendant Clairmont Paciello's Motion To Dismiss Is Denied Because Kentucky Law, Which Does Not Require A Certificate Of Merit, Applies To The Instant Dispute.

---

[124]  <u>Iqbal</u>, 556 U.S. at 678 (internal citations omitted).

[125]  <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.).

[126]  <u>Iqbal</u>, 556 U.S. at 678.

[127]  <u>Connelly</u>, 2016 WL 106159, at *4 (internal quotations and citations omitted).

Counts I and II of Plaintiff's Amended Complaint allege claims of negligence and gross negligence, respectively, against Defendant Clairmont Paciello & Co., P.C.[128] In its Motion to Dismiss, the sole justification that Defendant advances as to why Counts I and II should be dismissed is that Plaintiff has failed to file a certificate of merit pursuant to Pennsylvania Rule of Civil Procedure 1042.3.[129] That rule mandates the filing of such certificates in "any action based upon an allegation that a licensed professional deviated from an acceptable professional standard."[130]

In response, Plaintiff contends that Rule 1042.3 is inapplicable because the substantive law of the Commonwealth of Kentucky, which does not require a similar certificate, applies to the instant matter.[131] Because Plaintiff is correct about the application of Kentucky state law to this dispute, Defendant's motion to dismiss will be denied.

---

[128]   ECF No. 20 at 11–15, 16.

[129]   ECF No. 25 at 1.

[130]   Pa. R. C. P. 1042.3.

[131]   ECF No. 31 at 7–11.

"The first issue in deciding any choice of law question is to determine the applicable choice of law rules."[132] "In most instances bankruptcy courts rely on the rule observed by federal district courts hearing diversity cases and use the choice of law rules of the forum state."[133] "Because <u>Klaxon v. Stentor Electric Manufacturing Co.</u> make[s] clear that federal law may not be applied to questions which arise in federal court but whose determination is not a matter of federal law, state choice of law rules must be applied in adversary proceedings in bankruptcy court."[134]

Accordingly, "[i]n the absence of a specific federal policy or interest dictating the use of federal choice of law rules, it is well settled in this Circuit that a bankruptcy court faced with the issue of which substantive state law to apply to a claim for relief in an adversary proceeding applies

---

[132] <u>In re Eagle Enterprises, Inc.</u>, 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998), <u>aff'd</u>, 237 B.R. 269 (E.D. Pa. 1999).

[133] <u>Id.</u> (citing <u>Klaxon Co. v. Stentor Electric Manufacturing Co.</u>, 313 U.S. 487, 496 (1941)).

[134] <u>In re SemCrude, L.P.</u>, 407 B.R. 112, 133 (Bankr. D. Del. 2009) (internal citations and quotation marks omitted).

the choice of law rules of the forum state."[135] I will therefore turn to the

choice of law rules of the Commonwealth of Pennsylvania to determine

which state law should be applied.

Pennsylvania's choice-of-law analysis follows a "flexible rule which

permits analysis of the policies and interests underlying the particular

issue before the court."[136] Under this approach, Pennsylvania courts are to

apply the law of the forum with the 'most interest in the problem,' rather

than the law of the place of injury."[137] "We must first determine whether

there is a true conflict between the relevant laws."[138] "If a true conflict

exists, the Court must then determine which state has the greater interest

in the application of its law."[139]

---

[135]  Id.

[136]  Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 229 (3d Cir. 2010) (quoting Griffith v. United Air Lines, Inc., 416 Pa. 1, 21, 203 A.2d 796, 805 (1964)).

[137]  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 227 (3d Cir. 2007) (quoting Griffith, 203 A.2d at 806).

[138]  Specialty Surfaces, 609 F.3d at 230.

[139]  Hammersmith, 480 F.3d at 231 (internal citation and quotation marks omitted).

The parties do not dispute that while Pennsylvania law requires the filing of a certificate of merit prior to the commencement of a professional negligence claim, Kentucky law imposes no such prerequisite.[140] "When both states' interests would be harmed by the application of the other state's law, there is a 'true conflict.'"[141] I think it evident that the each state's governmental interests and policy preferences would be frustrated by application of the other state's law given that one state imposes a certificate of merit requirement while the other does not.

Having established the existence of a true conflict, I must now consider which state has the greater interest in the application of its law. The United States Court of Appeals for the Third Circuit has characterized Pennsylvania's choice of law analysis "as a combination of the approaches of both the Restatement II (contacts establishing significant relationships)

---

[140]   ECF No. 26 at 8.

[141]   <u>Specialty Surfaces</u>, 609 F.3d at 230.

and interests analysis (qualitative appraisal of the relevant States' policies with respect to the controversy)."[142]

In <u>Hammersmith v. TIG Insurance Co.</u>, for example, the Third Circuit applied § 188 of the Restatement (Second) of Conflict of Laws to resolve a conflict arising under Pennsylvania state choice of law analysis. That section, entitled "Law Governing in Absence of Effective Choice by the Parties," provides the following factors for a court's consideration in cases involving disputes arising from commercial contracts:

(a)    the place of contracting,

(b)    the place of negotiation of the contract,

(c)    the place of performance,

(d)    the location of the subject matter of the contract, and

(e)    the domicile, residence, nationality, place of incorporation and place of business of the parties.

Relatedly, in cases involve tortious conduct, Pennsylvania courts have applied the following list of similar factors from § 145 of the Restatement (Second) of Conflict of Laws:

---

[142]  <u>Hammersmith</u>, 480 F.3d at 231.

(a)     the place where the injury occurred,

(b)     the place where the conduct causing the injury occurred,

(c)     the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d)     the place where the relationship, if any, between the parties is centered.

Significantly for our purposes, § 148 of the Restatement (Second) of Conflict of Laws also provides a specific set of factors to consider in the analogous context of fraud and misrepresentation cases.[143] Subpart (1) of that section states as follows:

> When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless . . . some other state has a more significant relationship . . . to the occurrence and the parties, in which event the local law of the other state will be applied.

---

[143]  I believe it worthwhile to note that a preordained list of factors for a choice of law analysis in the professional negligence setting is not to be expected, given that seekers of such services so often turn to certified public accountants, doctors, or lawyers that do business in the client's home state. Nevertheless, I believe that each of these lists of factors proves instructive as to the salient points that should be considered to resolve the parties' dispute here.

Subpart (2) of § 148 thereafter lists the following factors for

"determining the state which, with respect to the particular issue, has the

most significant relationship to the occurrence and the parties":

(a)     the place, or places, where the plaintiff acted in reliance upon
        the defendant's representations,

(b)     the place where the plaintiff received the representations,

(c)     the place where the defendant made the representations,

(d)     the domicile, residence, nationality, place of incorporation and
        place of business of the parties,

(e)     the place where a tangible thing which is the subject of the
        transaction between the parties was situated at the time, and

(f)     the place where the plaintiff is to render performance under a
        contract which he has been induced to enter by the false
        representations of the defendant.

"These contacts are to be evaluated according to their relative

importance with respect to the particular issue."[144] "[A] mere counting of

contacts is not what is involved. The weight of a particular state's contacts

must be measured on a qualitative rather than quantitative scale."[145] "At

least some of the factors . . . will point in different directions in all but the

---

[144]   Restatement (Second) of Conflict of Laws § 188(2) (1971).

[145]   Cipolla v. Shaposka, 439 Pa. 563, 566, 267 A.2d 854, 856 (1970).

simplest case. Hence any rule of choice of law, like any other common law rule, represents an accommodation of conflicting values."[146]

Interpreting Pennsylvania state choice of law analysis, the United States District Court for the Eastern District of Pennsylvania has observed that "[w]hen the injury sustained is of a pecuniary nature, the plaintiff's principal place of business is generally considered the place of injury and represents a contact of substantial significance."[147] In that case, the district court found that where a plaintiff corporation with a principal place of business in Pennsylvania sued a defendant corporation with a principal place of business in Tennessee for interference with contractual relations, the appropriate law to be applied was that of the plaintiff's principal place of business.[148] Such was the result because the alleged injury was "damage to Plaintiff's prospective business relationships," which relationships were

---

[146] Restatement (Second) of Conflict of Laws § 188 cmt. (c).

[147] <u>CAT Internet Servs., Inc. v. Magazines.com Inc.</u>, No. CIV. A. 00-2135, 2001 WL 8858, at *4 (E.D. Pa. Jan. 4, 2001).

[148] <u>Id.</u>

necessarily "centered in" the state of the claimant's principal place of business.[149]

In a further decision, the New Jersey Superior Court, Appellate Division, applying New Jersey's nearly identical "governmental interest analysis" to determine choice of law, held, in a professional malpractice lawsuit between a plaintiff corporation doing business in New Jersey and the defendant KPMG Peat Marwick, a New York accounting partnership, that the appropriate substantive law to apply was that of New Jersey.[150] In that case, the defendant New York accounting firm had produced audit reports for a third-party New Jersey corporation, upon which the plaintiff New Jersey corporation relied in deciding to enter into certain agreements with the third-party corporation.[151] The third-party corporation ultimately declared bankruptcy, causing the plaintiff to incur substantial losses.[152]

---

[149] See id.

[150] See Performance Motorcars of Westchester, Inc. v. KPMG Peat Marwick, 274 N.J. Super. 56, 58, 643 A.2d 39, 40 (App. Div. 1994).

[151] Id. at 40.

[152] Id.

To select the appropriate substantive law, the court considered "the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties."[153] The particular conflict in the case was a New York state law requiring privity in professional malpractice actions and the nonexistence at the time of such a requirement under New Jersey law.[154] The court acknowledged that the New York requirement signified "an undeniable interest in regulating the extent to which an accounting firm licensed to practice within its borders may be liable for work performed," whereas the New Jersey regime "sought to encourage accountants to exercise greater care leading to greater diligence in conducting audits, thereby elevating the standards of the profession."[155]

The court thereafter reviewed the contacts of the state of New Jersey. It noted that the plaintiff, as the ultimate end-user of the questioned audit,

---

[153] Id. (quoting Veazey v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986)).

[154] Performance Motorcars, 643 A.2d at 40.

[155] Id.

had its principle of place of business in New Jersey; all of the directors and

officers of the affected company were New Jersey residents; the plaintiff

was authorized to do business in New Jersey and paid various forms of tax

there; reliance on the audit report occurred in New Jersey; and the

eventual financial damage was incurred by the New Jersey plaintiff.[156]

In contrast, the court noted that "New York's contacts with the

parties and this litigation are not insignificant, but are qualitatively less

than those of New Jersey's."[157] That was the case even though the

defendant was a New York partnership regulated by "New York's

policy."[158] The Court reasoned as follows:

> We recognize for the purpose of this opinion that the Peat
> Marwick partner in charge of the audit worked out of the
> New York office; all of the planning and implementation of
> the audit was conducted in New York; and the final auditor's
> report was drafted, signed and issued in New York. Thus, the
> alleged negligent misrepresentations or other negligent
> conduct occurred in New York. However, the audit report
> was sent to a New Jersey client and used here in a business

---

[156] <u>Id.</u> at 41.

[157] <u>Id.</u>

[158] <u>Id.</u>

transaction which was almost exclusively New Jersey based. We do not believe that those contacts with New York are qualitatively more significant than the parties' contacts with New Jersey.[159]

An important consideration in the <u>Performance Motorcars</u> decision was the fact that the defendant was "clearly a national firm doing business outside of New York's territorial borders."[160] Therefore, New York accountants "could not possibly expect [New York's] protective rule to apply where the accountant's work, performed at least partially in another state, caused injury outside its jurisdiction."[161] To hold otherwise "would be an impermissible intrusion into the affairs of other states."[162]

Of all the arguments raised in the pertinent case law and in the parties' briefs, that is perhaps the most persuasive one, given the deference this Court affords our Constitution's federalist principles. As it relates to the instant matter, when Defendant Clairmont Paciello chose to service

---

[159] <u>Id.</u>

[160] <u>Id.</u>

[161] <u>Id.</u>

[162] <u>Id.</u>

clients in other states, it implicitly acknowledged the possibility that it would be bound by the regulations of those other states. Conducting business outside of the home state functions for modern-day corporations as a <u>quid pro quo</u> with the pertinent regulatory regimes of those states: the corporation operates in a given state, reaps the benefits of ease of entry and revenue collection, and in return, agrees to be bound by the pertinent laws of that state. The presence or absence of a certificate of merit is no exception.

As the Honorable Michael Chagares, writing for the United States Court of Appeals for the Third Circuit, described this relationship in the analogous context of personal jurisdiction, "Out-of-state residents who exercise the privilege of conducting activities within a state enjoy the benefits and protection of the state's laws; in exchange, they must submit to jurisdiction over claims that arise from or relate to those activities."[163] Any other outcome, particularly one that wrongly prioritized a defendant corporation's principle place of business in the choice of law analysis,

---

[163] <u>O'Connor v. Sandy Lane Hotel Co.</u>, 496 F.3d 312, 322 (3d Cir. 2007) (internal quotation marks omitted).

would not only be inconsistent with the reciprocal nature of that

relationship but would also foster perverse incentives for professional

services corporations to shelter in states with liability-adverse regimes,

while continuing to reap the benefits of interstate commerce in other

forums.

Free market principles also counsel for application of Kentucky law,

the home state of the Plaintiff who was the recipient of Defendant's

services. To the extent that the Defendant Clairmont Paciello argues that

the application of one state's laws—here, Kentucky's—make it more costly

to operate in that forum due to the prospect of malpractice liability

unchecked by a certificate of merit requirement, amelioration of such a

consequence is best left to the business's own contractual decisions and to

the judgment of the Kentucky legislature.

For instance, if the prospect of serving clients in a state like

Kentucky creates more risk for a professional servicer like Clairmont

Paciello, then perhaps that servicer can adjust its rates accordingly. In turn,

if those higher rates make obtaining professional services more expensive

for Kentucky business owners, then perhaps those owners will petition their legislators to adopt a certificate of merit requirement. The solution, however, should be democratically arrived at, rather than judicially-imposed.

Accordingly, as recounted by the facts alleged in the Amended Complaint, Plaintiff was a Kentucky-based business whose principal place of business was in Kentucky. Plaintiff's CEO, Mr. Brothers, and his wife, whose actions played a primary role in this litigation were both Kentucky residents. The accounting services, although performed by Pennsylvania accountants, had their ultimate end user in Kentucky, evaluated the financial status of a Kentucky entity, affected the business decisions of managers and directors in Kentucky, and ultimately were an alleged source of harm to the state of Kentucky, its tax base, and its employees, when the Kentucky-based manufacturer declared bankruptcy.

To that end, the facts gathered for the completion of the audit were gathered in Kentucky from a Kentucky's business's records, the reports for the Kentucky client were sent to and paid in Kentucky, and the audits and

reliance on those reports occurred in Kentucky, at which point representations about a Kentucky's company's financial status were made in formal reports and sent from Kentucky to the SEC. Eventually, the investigation into the rad-chip scheme was also based in and prosecuted in Kentucky.

These considerations embrace the factors as set forth in the Restatement (Second) of Conflict of Laws §§ 145, 148, and 188 and applied by the Third Circuit. Based on the foregoing analysis, substantive law of the state of Kentucky should apply. It is worth noting for the record that no other party to this litigation besides Clairmont Paciello challenges that proposition.

Apart from its own weighting of the above factual considerations, Defendant makes one additional argument. According to Defendant, the certificate of merit rule "is not predicated upon substantive elements of a negligence cause of action, nor burdens of proof in a professional liability claim," but is instead a procedural "prerequisite."[164]  It cites Liggon-

---

[164]  ECF No. 32 at 3.

<u>Redding v. Estate of Sugarman</u> for support.[165] This Court has reviewed the

Honorable Richard L. Nygaard's opinion in the <u>Liggon-Redding</u>, and the

strained interpretation of the case that Defendant now offers is wholly

unpersuasive. As Judge Nygaard explained, "we conclude that

Pennsylvania Rule 1042.3, mandating a certificate of merit in professional

negligence claims, is substantive law under the <u>Erie</u> Rule and must be

applied as such by federal courts."[166]

Therefore, because the law of Kentucky rather than that of

Pennsylvania applies and because the law of Kentucky does not require a

certificate of merit in professional negligence actions, Defendant Clairmont

Paciello's motion to dismiss is denied in full.

> **B.  Defendants Mountjoy Chilton Medley, Thompson Coburn, And Michael de Leon Hawthorne's Motions To Dismiss Are Denied, Because At This Stage In The Litigation, Application Of The Doctrine Of <u>In Pari Delicto</u> Has Not Been Properly Established; Running Of The Statue Of Limitations Has Not Been Adequately Shown; And The Gross Negligence Claims Have Plausibly Been Alleged.**

---

[165]   ECF No. 32 at 1 (citing 659 F.3d 258 (3d Cir. 2011)).

[166]   <u>Id.</u> at 264–65.

The primary argument between the parties as to Defendant Mountjoy Chilton Medley's and the Thompson Coburn Defendants' Motions to Dismiss is over application of the <u>in pari delicto</u> defense to Plaintiff's claims. "The Latin phrase Kentucky courts use as shorthand to refer to 'equal fault' is <u>in pari delicto</u>."[167] "The doctrine does not require that tortfeasors be literal 50/50 partners in the plaintiff's injury. Parties are <u>in pari delicto</u> where they are guilty of concurrent negligence of substantially the same character, which converges to cause the plaintiff's damages."[168]

The doctrine is often phrased as the maxim "when both parties are guilty, the court will leave them where it finds them."[169] It derives from the Latin phrase <u>in pari delicto potior est conditio defendentis</u>: "In a case of equal or mutual fault . . . the position of the [defending] party . . . is the

---

[167] <u>Stanford v. United States</u>, 948 F. Supp. 2d 729, 744 (E.D. Ky. 2013) (internal quotation marks supplied).

[168] <u>Id.</u> (internal quotation marks omitted).

[169] <u>Forbes v. City of Ashland</u>, 246 Ky. 669, 55 S.W.2d 917, 919-20 (1932).

better one."[170] "The defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality."[171]

The United States Court of Appeals for the Third Circuit has sanctioned the application the <u>in pari delicto</u> defense in the bankruptcy context, when it joined several other circuits that "have also applied the <u>in pari delicto</u> doctrine to bar claims of a bankruptcy trustee, standing in the shoes of a debtor, against third-parties, without regard to the trustee's status as an innocent successor."[172] That being said, the doctrine "is subject to appropriate and necessary limits" in that "matters of public policy are to be taken into consideration in determining the defense's availability in any given set of circumstances."[173]

---

[170] <u>Bateman Eichler, Hill Richards, Inc. v. Berner</u>, 472 U.S. 299, 306, 105 S. Ct. 2622, 2626, 86 L. Ed. 2d 215 (1985).

[171] <u>Id.</u> (internal footnote omitted).

[172] <u>Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.</u>, 267 F.3d 340, 358 (3d Cir. 2001) (Fuentes, J.).

[173] <u>Id.</u> at 354.

In pari delicto "is not to be woodenly applied and vindicated in any and all instances, but instead may be trumped by another public policy more important than the policy basis for the doctrine itself."[174] In fact, "[t]here may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be."[175]

"Accordingly, a private action for damages in these circumstances may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the [ ] laws and protection of the [ ] public."[176] Specifically, under Kentucky law, "Parties are in pari delicto when they 'are guilty of concurrent negligence of substantially the same character which converges

---

[174] Id.

[175] Bateman Eichler, 472 U.S. at 307.

[176] Id. at 310–11.

to cause the plaintiffs damages.'"[177] In Kentucky and elsewhere, the <u>in pari delicto</u> doctrine appears to track closely the related agency law concept of imputation of an agent's (officer's) wrongful acts to that of his principal (the corporation).[178]

The primary exception to the doctrine is called the "adverse interest exception."[179] "The adverse interest exception provides that knowledge of the agent is not imputed to the principal when it is clear that the agent would not communicate the fact in controversy to the principal."[180] "For example, where the communication of a fact would 'necessarily prevent the <u>consummation of a fraudulent scheme which the agent was engaged in perpetrating</u>,' the agent's knowledge is not imputed to the principal."[181]

---

[177] <u>Compton v. City of Harrodsburg, Ky.</u>, No. 5:12-CV-302-JMH-REW, 2013 WL 5503195, at *5 (E.D. Ky. Oct. 2, 2013) ((citing <u>Lexington Country Club v. Stevenson</u>, 390 S.W.2d 137, 143 (1965)).

[178] <u>See, e.g.</u>, <u>BancInsure, Inc. v. U.K. Bancorporation Inc./United Kentucky Bank of Pendleton Cty., Inc.</u>, 830 F. Supp. 2d 294, 301–02 (E.D. Ky. 2011).

[179] <u>See</u> <u>id.</u> at 302.

[180] <u>Id.</u>

[181] <u>Id.</u> (emphasis in original).

Thus, the Court of Appeals of Kentucky has explained that application of the <u>in pari delicto</u> doctrine "is destroyed and has no basis when the transaction relates to personal matters of the agent or servant and where his interests are adverse to those of his principal."[182]

Not to be outdone, the adverse interest exception is itself subject to three exceptions. That is to say, in three limited circumstances, presence of the adverse interest exception can nevertheless be overridden so that the defense may still apply. "The adverse interest exception is not applicable under any of the following situations: '(1) [w]here the interested officer is the sole representative of two corporations; (2) where the corporation benefits by the transaction; and (3) where the interested agent acts for the principal, instead of dealing with him, in which case the presumption of communication obtains.'"[183] It is the application of these second and third

---

[182] <u>Illinois Cent. R. Co. v. Fontaine</u>, 217 Ky. 211, 289 S.W. 263, 268 (1926). At the time the <u>Illinois Central</u> decision was issued, the Court of Appeals was Kentucky's highest court. That changed in 1976 with the establishment of the Supreme Court of Kentucky.

[183] <u>BancInsure, Inc. v. U.K. Bancorporation Inc./United Kentucky Bank of Pendleton Cty., Inc.</u>, 830 F. Supp. 2d 294, 302-03 (E.D. Ky. 2011) (quoting Ohio

exceptions to the exception that the parties vigorously contest, a debate

whose ultimately conclusion will likely hasten the resolution of this

litigation on motion for summary judgment or at trial.

Mountjoy Chilton Medley and the Thompson Coburn Defendants

both argue that Valley Forge benefited from Brothers's scheme because

certain of the illicit proceeds were deposited in Valley Forge's business

accounts and used to (artificially) bolster the company's financial

statements. To the contrary, the Plaintiff suggests that Brothers's scheme

was at all times conducted for his own personal gain, and to the extent that

his wrongdoing can even be characterized to have benefitted Valley Forge,

that benefit was incidental and short-lived. Essentially, the parties dispute

the quantum of benefit required by Kentucky courts to apply in pari

delicto as a matter of law, and perhaps more important at this stage

procedurally, the parties also contest the force of the particular facts of this

matter, the Amended Complaint's assertions, and the proffered defenses,

---

Valley Banking & Trust Co. v. Citizens' Nat'l Bank, 173 Ky. 640, 191 S.W. 433, 438 (1917)).

to the extent that they speak to the benefit, if any, that Valley Forge gained

from Brothers's wrongdoing.

For instance, Plaintiff suggests, through several of its averments,

that Brothers acted solely for his own benefit and for the benefit of

Minitron, concealing the funds from Valley Forge and using the

company's authorization solely to disguise the illegal transactions.

Essentially, Plaintiff contends that Valley Forge was a mere vehicle as to

Brothers's fraudulent behavior, not an ultimate beneficiary. The Amended

Complaint further raises significant questions as to whether a fraudulent

scheme that ultimately led Valley Forge to file for bankruptcy can properly

be construed as having "benefited" the company in any fashion.[184] Because

the Plaintiff has alleged facts plausibly suggesting that the doctrine of in

---

[184]  It is also worth noting here that although certain courts have granted motions
to dismiss on professional malpractice and related claims based on an in pari
delicto defense at the motion to dismiss stage, the majority of the recent
keynote decisions on topic have been disposed of at the summary judgment
stage. See, e.g., BancInsure, Inc. v. U.K. Bancorporation Inc./United Kentucky
Bank of Pendleton Cty., Inc., 830 F. Supp. 2d 294, 301–02 (E.D. Ky. 2011).
Official Comm. of Unsecured of Allegheny Health, Educ. & Research Found.
v. PricewaterhouseCoopers, LLP, 607 F.3d 346, 348 (3d Cir. 2010).

pari delicto does not apply here, these evidentiary disputes further

support my decision that this case is not ripe for disposition at the motion

to dismiss stage.

Accordingly, the parties are on notice that, when the Court

reevaluates application of the in pari delicto doctrine at the summary

judgment stage, evidence bearing upon the following questions will

greatly impact my disposition of that issue:

- To what extent can Valley Forge be said to have benefited from Brothers's rad-chip scheme?

- What quantum of benefit is required to trigger application of the in pari delicto doctrine under Kentucky law?

- To what extent must the wrongdoing committed by Brothers be similar in character and close in time to that allegedly committed by the Defendants?

- To what extent did Valley Forge exercise possession or control of the funds from the illicit scheme?

- Were the funds routed to or held in Valley Forge accounts for significant periods of time or was Valley Forge merely used as an intermediary to facilitate the fraud?

- To what extent were other employees or officers of Valley Forge other than Rosemary Brothers aware of the accounts used to launder proceeds from the rad-chip scheme, or were the accounts wholly concealed?

- Did the illicit funds overstate Valley Forge's financial metrics in a way that allowed the company to issue additional stock, obtain more favorable interest rates on loans or coupon rates on bonds, that resulted in other favorable financial ratings for the company, or that kept Valley Forge from becoming insolvent, defaulting on obligations, or filing for bankruptcy earlier than it eventually did?

- Did Valley Forge use the subject funds to pay expenses, wages, etc.?

- Did Valley Forge benefit in any way from Brothers' repayment of his personal loan to the company?

- Did Valley Forge benefit in any way from its agreements with Minitron?

- Did Valley Forge benefit from Brothers's scheme in any other way(s) not enumerated above that warrant application of the in pari delicto doctrine or that otherwise warrant imputation of Brothers's acts to Valley Forge?

- How should the Court construe a fraudulent scheme by a company's officer in the context of the in pari delicto doctrine if that scheme has both a beneficial short-term effect on the company but also a negative long-term impact?

- To what extent were any other Valley Forge employees or officers besides Rosemary Brothers aware of or participants in the rad-chip scheme?

- Was Brothers working within the scope of his employment when he committed the rad-chip fraud?

- Was Brothers's scheme carried out solely for his own self-interest?

- Were Brothers's interests completely adverse to those of Valley Forge's during the course of the rad-chip scheme?

- What are the economic and legal consequences that would result from characterizing Valley Forge as a beneficiary in this and future cases?

It is the Court's view that resolving the above issues will assist resolution of what is essentially a mixed question of law and fact. At the time for filing dispositive motions, the Court is also likely to allow extensive briefing on the in pari delicto issue and to request oral argument.

Relatedly, both the Mountjoy Chilton Medley and the Thompson Coburn Defendants take issue with the Amended Complaint's claims calling for punitive damages to redress gross negligence. "'Gross negligence' is a wanton or reckless disregard for the lives, safety or property of others."[185] "The threshold for the award of punitive damages is whether the misconduct was "outrageous" in character, not whether the injury was intentionally or negligently inflicted."[186]

That an alleged fraud of this extent went undetected is particularly difficult to fathom, and Plaintiff has therefore alleged sufficient facts to

---

[185] Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC, 277 S.W.3d 255, 267–68 (Ky. Ct. App. 2008).

[186] Id. at 268.

permit the gross negligence and punitive damages claims to survive the

motion to dismiss stage. "If the plaintiff's proof [ ] fails to make a

submissible case on 'fraud' but does make a submissible case on 'wanton

and reckless misstatement,' then the defendant accountant may be subject

to liability even though all of the strict elements of proof of intentional

fraudulent conduct are not sufficiently shown."[187]

Plaintiff's allegations that in fact no momentum wheel contracts

existed, that the Lucy spreadsheets made this explicit, that an appropriate

reconciliation was neglected, that generally accepted accounting standards

were not followed, and that materially false and misleading financial

statements were filed with the SEC as a result of these oversights satisfy

the plausibility requirement as to gross negligence claims in auditor

liability cases at the motion to dismiss stage.[188]

---

[187] Ingram Indus., Inc. v. Nowicki, 527 F. Supp. 683, 685 (E.D. Ky. 1981).

[188] See id. ("[T]he present status of common law liability of an accountant for fraud is that gross negligence is sufficient to hold the accountant liable for fraud, and that the failure to disclose after-acquired information which makes the first report false, when it is known that third parties are relying on the original report, can make the accountant liable for fraud."). However, I find it important to note that, at this stage, the Court considers the gross negligence

For similar reasons, Counts Six and Seven against the Thompson

Coburn Defendants, alleging breach of fiduciary duty and objecting to

Thompson Coburn's bankruptcy claim based on related equitable

principles, should also survive the motion to dismiss stage for further

factual development. "[T]he basic elements of a breach-of-fiduciary-duty

cause of action [are]: (1) the existence of a fiduciary duty; (2) the breach of

that duty; (3) injury; and (4) causation."[189] As just recited, Plaintiff's

Amended Complaint alleges sufficient facts in terms of a duty, breach,

causation, and damages to permit these claims to survive the motion to

dismiss stage. Moreover, Plaintiff's objection to Thompson Coburn's claim

necessarily depends on resolution of the substantive common law counts.

Again, however, the parties are reminded that survival of these claims at

this stage means little for how the Court will evaluate them on summary

---

allegation against Mountjoy Chilton Medley to be far less extensive and
compelling than that raised against the Thompson Coburn Defendants.

[189] Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C., 436 S.W.3d
189, 193 (Ky. 2013).

judgment—particularly if the evidence reveals no genuine dispute of material fact as to Plaintiff's claims of reckless conduct.[190]

Finally, Defendant Mountjoy Chilton Medley challenges the timeliness of Plaintiff's professional negligence claims. Mountjoy Chilton Medley is the only Defendant to challenge this aspect of Plaintiff's claim, and I believe that, based upon the limited facts available to support the Defendant's contentions at this point in the litigation, its challenge should fail. Kentucky's applicable statute of limitations provides as follows:

> Notwithstanding any other prescribed limitation of actions which might otherwise appear applicable, except those provided in KRS 413.140, a civil action, whether brought in tort or contract, arising out of any act or omission in rendering, or failing to render, professional services for others shall be brought within one (1) year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured.

---

[190] See id. ("This submissibility issue can only be determined after the evidence on the merits produced by the parties has been assessed. The foregoing discussion should not be taken to say that the plaintiff will be able to make a submissible case on either or both of the claims asserted in Counts VII and VIII. The Court is quite aware that it is dealing with a situation of restricted liability. We are, however, unable to say at this time that the plaintiff is unable to make such a submissible case as to either or both of the claims asserted. Accordingly, the motion of the defendant Touche Ross to dismiss Count VII and Count VIII of the plaintiff's amended complaint will be denied by separate order.").

Time shall not commence against a party under legal disability until removal of the disability.[191]

Plaintiff contends that the statute of limitations did not begin to run until sometime in or around January or February of 2013, when the federal investigation into Brothers's conduct was initiated, and the company made a corresponding public announcement. "At that time," Plaintiff notes, "the Government seized Valley Forge's bank accounts and, upon the public announcement of the Government's action, the company's stock plummeted and it became unable to raise capital or continue its business operations, thereby resulting in its financial collapse. At no time prior to this period, had Valley Forge sustained any 'irrevocable nonspeculative injury' under Kentucky law."[192] Thus, according to Plaintiff, because Valley Forge filed for bankruptcy on October 9, 2013, 11 U.S.C. § 108's automatic stay provision permitting the filing claims for as long as "two years after the order for relief" preserved the present action. To the contrary, Defendant Mountjoy Chilton Medley contends that it began to

---

[191]   KRS § 413.245.

[192]   4:15-cv-01731, ECF No. 19 at 14.

run by May of 2012, at which time several of Valley Forge's employees are said to have been made aware of the scheme.

"Until the legal harm became fixed and non-speculative, the statute did not begin to run."[193] In recent years, Kentucky courts have clarified that "[t]he statute of limitations begins to run as soon as the injury becomes known to the injured."[194] Such a determination also appears to be contingent upon the type of professional conduct at issue. For instance, legal malpractice claims based upon a pending litigation, transactional legal malpractice claims, medical, engineering/surveying malpractice claims, each necessarily implicate differing timelines.

At particular issue on this motion is the extent to which the extent of the damages resulting from the rad-chip scheme and Defendant's purported negligent work needed to be ascertainable before the statute began to run. As the United States District Court for the Eastern District of

---

[193]  Alagia, Day, Trautwein & Smith v. Broadbent, 882 S.W.2d 121, 125-26 (Ky. 1994).

[194]  Matherly Land Surveying, Inc. v. Gardiner Park Dev., LLC, 230 S.W.3d 586, 591 (Ky. 2007).

Kentucky stated in <u>Northwestern National Insurance Company v.</u>

<u>Osborne</u>:

> [T]he present law of Kentucky requires the following three
> elements for the accrual of a cause of action for legal
> malpractice: (1) a negligent act or omission on the part of the
> attorney; (2) the occurrence of damage that is not merely
> speculative as a proximate result of such act or omission; (3)
> discovery of the negligence and damage by the client. The
> addition of the prerequisite of the discovery factor by the
> statute did not negate the <u>sine qua non</u> of damage.[195]

That being said, "Kentucky law has never required a specified dollar

amount be known before the statute of limitations can run."[196]

Still, Plaintiff finds plausible support in the pertinent case law. For

example, applying Kentucky law, one court has observed that "[a] cause of

action does not exist until the conduct causes injury that produces loss or

damage."[197] In that case, the court held that in a legal malpractice dispute

involving estate planning, "the discovery of negligence was ineffective as

the final result was not yet known. Not until damages were fixed by the

---

[195]   610 F. Supp. 126, 127 (E.D. Ky. 1985), <u>aff'd</u>, 787 F.2d 592 (6th Cir. 1986).

[196]   <u>Matherly Land Surveying, Inc. v. Gardiner Park Dev.</u>, LLC, 230 S.W.3d 586,
591 (Ky. 2007).

[197]   <u>Alagia, Day, Trautwein & Smith v. Broadbent</u>, 882 S.W.2d 121, 126 (Ky. 1994).

final compromise with the IRS was there an occurrence of the type required to commence the running of the statute."[198]

Likewise, in a case involving negligent title searching, the Supreme Court of Kentucky held that the statute of limitations began running "as of the date of the foreclosure sale, when appellant's loss was "realized."[199] "Prior to that date, Appellants had only a fear that they would suffer a loss on the property. Their fear was not realized as damages until the sale of the property."[200]

Further, as the Supreme Court of Kentucky has described for litigation-based negligence claims, "[w]here, as in the present case, the cause of action is for 'litigation' negligence, meaning the attorney's negligence in the preparation and presentation of a litigated claim resulting in the failure of an otherwise valid claim, whether the attorney's

---

[198] See id.

[199] Meade Cty. Bank v. Wheatley, 910 S.W.2d 233, 235 (Ky. 1995).

[200] Id.

negligence has caused injury necessarily must await the final outcome of the underlying case."[201]

Analogous to the present case, in 2007, the Supreme Court of Kentucky heard a dispute dealing with application of the statute of limitations in an auditing malpractice action. The fact pattern there involved a plaintiff who sued its third-party auditors for failing to detect inconsistencies on the financial statements of an insurance company that it later purchased. The Supreme Court of Kentucky wrote, "the obvious problems with [the insurance company's] reserve setting system did not by themselves mean [the plaintiff] should have known of [the auditor's] alleged negligence. However, that [the plaintiff] had to make a significant adjustment, and in essence suffered losses after having had the benefit of [the] audit report, should have put them on notice that something was wrong with the report."[202] Thus, the statute began running when the plaintiff completed its purchase and received a memorandum from one of

---

[201] Michels v. Sklavos, 869 S.W.2d 728, 730 (Ky. 1994).

[202] Queensway Fin. Holdings Ltd. v. Cotton & Allen, P.S.C., 237 S.W.3d 141, 151 (Ky. 2007).

the insurance company's officials because "[a]t that time, [the plaintiff] had

knowledge of a reduction in the value of [the insurance company] and

should have known that something was amiss with the way reserves were

being calculated."[203]

As such and similar to the <u>in pari delicto</u> issue in this matter,

although Plaintiff has alleged sufficient facts under the law to preserve its

claims, there exist several open questions as to whether the May 2012

timeframe can mark the beginning of the statute's running, questions

whose answers could greatly influence the Court's determination on

summary judgment. "Such questions are more appropriately decided at

the summary judgment stage or at trial, with the benefits of discovery and

a full evidentiary record."[204] For instance:

- Is knowledge of the rad-chip scheme the same as knowledge of the
accountant's alleged negligence?

- Does Kentucky law require some legal or business outcome, such as
an indictment or declaration of bankruptcy, to properly ascertain the

---

[203] <u>Id.</u>

[204] <u>Coloplast A/S v. Oakwell Distribution Inc.</u>, No. CIV.A. 15-1592, 2015 WL
3872295, at *2 (E.D. Pa. June 23, 2015).

extent of the negligence and to begin the statute's running in corporate fraud cases?

- Would knowledge of certain of a company's officers or employees be sufficient to begin the statute's running, whereas knowledge by others would be insufficient?

- Were the May 2012 concerns ever adequately communicated to Valley Forge's board of directors or officers other than Brothers?

- What evidence shows that knowledge of the cause of action and nonspeculative damages was held by Valley Forge on or around May 2012 but before the automatic stay became effective?

- How should alleged negligence in the accounting industry be treated under Kentucky's statute of limitations precedents, given its prior legal malpractice holdings in both litigation and transactional matters, as well as in other professional negligence settings?

- Should Valley Forge, in the exercise of reasonable diligence, have discovered the fraud and the consequential accounting misstatements on or before May 2012? How should that determination impact the statute of limitations?

- When can a corporation be said to incur "damage" from an allegedly negligent accounting work performed on its financial statements?

- Had the federal investigation never occurred, when, if at all, would the statute of limitations begin to run?

- Relatedly, does the running of the statute of limitations in the corporate fraud setting depend at all upon the corporation's ability or inability to raise additional capital, maintain solvency, etc.?

- Was Mountjoy Chilton Medley continuing to service certain of Valley Forge's accounting needs after 2012, and how should that continued service affect the statute of limitations running, if at all?

"[T]he Court believes that the benefit of discovery would greatly enlighten the issues in this case."[205] Accordingly, although I hold for the purpose of this motion to dismiss that Plaintiff's Amended Complaint adequately alleges that the statute of limitations did not begin running until the breadth of the rad-chip scheme was more fully realized and its ultimate impact on the company's continued existence was reasonably evident, there will be significant opportunity for the Defendant to rebut these allegations with the assistance of a more complete factual record.

For the foregoing reasons, the motions to dismiss filed by Mountjoy Chilton Medley, Thompson Coburn, and Michael de Leon Hawthorne are denied in full. However, several of the core issues, including those involving application of the in pari delicto doctrine and the running of the statute of limitations as to Mountjoy Chilton Medley, will necessarily be revisited at the summary judgment stage with the benefit of discovery.

---

[205] Mastercraft Interiors, Ltd. v. ABF Freight Sys., Inc., 284 F. Supp. 2d 284, 289 (D. Md. 2003).

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss are denied in full. Kentucky law governs this dispute. Given the open questions of fact and law that remain at this point, application of the <u>in pari delicto</u> defense and the precise running of the statute of limitations are more appropriately disposed of at summary judgment in this matter.

An appropriate Order follows.

BY THE COURT:


<u>s/ Matthew W. Brann</u>
Matthew W. Brann
United States District Judge